**RECORD NO. 14-1163**

In The

# United States Court Of Appeals

### For The Fourth Circuit

## SYNOVUS BANK; NATIONAL BANK OF SOUTH CAROLINA,

*Plaintiffs – Appellees,*

v.

## KEVIN J. TRACY; PATRICIA M. TRACY,

*Defendants – Appellants,*

and

**BENJAMIN W. ATKINSON; DANIEL S. HINKSON;
KATHERINE H. WILLIAMS; ANTHONY J. BARBIERI,**
*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT ASHEVILLE**

_____

## BRIEF OF APPELLANTS

_____

**Edward L. Bleynat, Jr.
H. Gregory Johnson
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC  28801
(828) 251-1588**

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1163__      Caption: __Synovus Bank v. Barron Wall__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Barron S. Wall, Anthony J. Barbieri, Kevin J. Tracy, and Patricia M. Tracy__
(name of party/amicus)

_____

 who is _____the appellant group_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                        ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐YES ☑NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                          ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Edward L. Bleynat, Jr.                    Date:        3/12/14

Counsel for: Appellants

# CERTIFICATE OF SERVICE
***************************

I certify that on _____3/12/14_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

William W. McGee, III                    W. Carleton Metcalf
Nelson Mullins Riley & Scarborough       The Van Winkle Law Firm
1320 Main Street, 17th Floor             11 North Market Street
Columbia, SC 29201                       Asheville, NC 28801

s/ Edward L. Bleynat, Jr.                            3/12/14
_____                    _____
        (signature)                                   (date)

- 2 -

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF JURISDICTION..............................................1

ISSUES POSED BY THIS APPEAL ..........................................1

STATEMENT OF THE CASE......................................................2

    STATEMENT OF THE FACTS ............................................5

        A.    Synovus Purposefully Promoted Sales of River Rock Lots...........................................................................5

        B.    Synovus Promoted the Sale of River Rock Lots to Kevin Tracy ...........................................................14

        C.    Synovus Promoted the Sale of River Rock Lots to Patricia Tracy .....................................................16

SUMMARY OF ARGUMENT ...................................................17

ARGUMENT ................................................................................19

    STANDARD OF REVIEW ..................................................19

        A.    Review of Rule 12(b)(6) Orders ..............................20

        B.    Review of Summary Judgment Orders.....................21

    DISCUSSION .......................................................................21

    I.    THE DISTRICT COURT ERRED IN DISMISSING THE ILSA COUNTERCLAIMS..............................21

        A.    The Basis for the District Court's Decision Was Erroneous.....................................................21

B.      The Bank Was a Developer Under ILSA ......................22

C.      Because of the ILSA Violations, the Borrowers
        Were Entitled to Cancel their Contracts and Are
        Entitled to Recover Damages from the Bank ...............29

II.     THE DISTRICT COURT ERRED IN DISMISSING
        THE COUNTERCLAIMS FOR NEGLIGENT
        MISREPRESENTATION ..........................................................32

III.    THE DISTRICT COURT ERRED IN ALLOWING THE
        BANK'S MOTION FOR SUMMARY JUDGMENT ON
        ITS PROMISSORY NOTE CLAIMS ....................................35

        A.      The Bank is Obligated to Act in Good Faith .................36

        B.      The Bank's Fraud Defeats Its Claims on the Notes ........37

IV.     THE DISTRICT COURT ERRED IN ALLOWING THE
        BANK'S SUMMARY JUDGMENT MOTION ON THE
        KEVIN TRACY COUNTERCLAIMS FOR FRAUD ............39

        A.      Fourth Circuit and North Carolina Law Support
                the Borrowers' Claims ....................................................41

        B.      The *Village of Penland* Case Does Not Alter the
                Analysis ...........................................................................46

        C.      Other Factors Support the Fraud Claims
                Proceeding .......................................................................47

        D.      Reasonable Reliance Elements are Satisfied .................48

V.      THE DISTRICT COURT ERRED IN ALLOWING THE
        BANK'S MOTION FOR SUMMARY JUDGMENT ON
        THE KEVIN TRACY COUNTERCLAIMS FOR
        UNFAIR COMMERCIAL PRACTICES .................................48

VI.    THE DISTRICT COURT ERRED IN ALLOWING THE
       BANK'S MOTION FOR SUMMARY JUDGMENT
       AGAINST PATRICIA TRACY ................................................52

VII.   THE DISTRICT COURT ERRED IN RULING THAT
       PATRICIA TRACY WAIVED HER
       COUNTERCLAIMS AND DEFENSES .................................52

CONCLUSION ........................................................................................55

REQUEST FOR ARGUMENT ..............................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**PAGE(S):**

**CASES:**

*Adickes v. S.H. Kress & Co.*,
 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ...............................21

*Alston v. Monk*,
 373 S.E.2d 463 (N.C. App. Ct. 1988)....................................................53, 54

*Ashcroft v. Iqbal*,
 556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................20

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544, 127 S. Ct. 1955 (2007) ........................................................20

*Bertotti v. Charlotte Motor Speedway, Inc.*,
 893 F. Supp. 565 (W.D.N.C. 1995).............................................................53

*Bledsole v. Johnson*,
 357 N.C. 133, 579 S.E.2d 379 (2003) .........................................................36

*Branch Banking and Trust Co. v. Thompson*,
 418 S.E.2d 694 (N.C. Ct. App. 1992)....................................................33, 34

*Camp v. Leonard*,
 515 S.E.2d 090 (N.C. Ct. App. 1999).........................................................33

*Charbonnages de France v. Smith*,
 597 F.2d 406 (4th Cir. 1979) ......................................................................21

*Cotton Mills v. Manufacturing*,
 218 N.C. 560, 11 S.E.2d 550 (1940) ..........................................................43

*Daniel Boone Complex v. Furst*,
 43 N.C. App. 95, 258 S.E.2d 379 (1979) ...................................................38

*De Sole v. United States*,
 947 F.2d 1169 (4th Cir. 1991) ....................................................................20

*Felty v. Graves–Humphreys Co.*,
   818 F.2d 1126 (4th Cir. 1987) ....................................................21

*Fortson v. McClellan*,
   508 S.E.2d 549 (N.C. Ct. App. 1998).................................... 53-54

*Freese v. Smith*,
   110 N.C. App. 28, 428 S.E.2d 841 (1993) ..................................44

*Great American Ins. Co. v. C.G. Tate Const. Co.*,
   303 N.C. 387, 279 S.E.2d 769 (1981) ........................................36

*Guyton v. FM Lending Servs., Inc.*,
   681 S.E.2d 465, 478 (N.C. Ct. App. 2009)..................................32

*Haavistola v. Community Fire Co. of Rising Sun, Inc.*,
   6 F.3d 211 (4th Cir. 1993) ..........................................................21

*Hammar v. Cost Control Marketing & Sales Management of Virginia*,
   757 F. Supp. 698 (W.D. Va. 1990)...................................24, 25, 26

*Hudson-Cole Dev. Corp. v. Beemer*,
   132 N.C. App. 341, 511 S.E.2d 309 (1999) ................................44

*In re Fifth Third Bank, N.A.—Village of Penland Litigation*,
   719 S.E.2d 171 (N.C. App. 2011) ........................................46, 47

*In re Total Realty Management*,
   706 F.3d 245 (4th Cir. 2013) ....................................23, 24, 26, 50

*Johnson v. Dunlap*,
   280 S.E.2d 759 (N.C. App. Ct. 1981)..........................................53

*Johnson v. Owens*,
   263 N.C. 754, 140 S.E.2d 311 (1965) ........................................44

*Keith v. Wilder*,
   241 N.C. 672, 86 S.E.2d 444 (1955) ..........................................44

*Laundry Machinery Co. v. Skinner*,
   225 N. C. 285, 34 S.E.2d 190 (1945) .........................................38

*Mapoy v. Carroll*,
   185 F.3d 224 (4th Cir. 1999). ...................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...........................21

*McCauley v. Home Loan Investment Bank*,
   __ F.3d ___ 2013 WL 1189292 (4th Cir. 2013)..........................................41

*McKinney v. Board of Trustees*,
   955 F.2d 924 (4th Cir. 1992) ......................................................................21

*Miller's Mut. Fire Ins. Ass'n. Parker*,
   234 N.C. 20 (N.C. 1951) .............................................................................53

*Mylan Laboratories, Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) ........................................................................20

*Nahigian v. Juno Loudoun, LLC*,
   684 F. Supp. 2d 731 (E.D.Va. 2010) .....................................................24, 31

*Olsen v. Lake Country, Inc.*,
   955 F.2d 203 (4th Cir. 1991) ......................................................................23

*Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*,
   172 N.C. App. 427, 617 S.E.2d 664 (2005) ..........................................*passim*

*Ragsdale v. Kennedy*,
   286 N.C. 130, 209 S.E.2d 494 (1974) ........................................................43

*Raritan River Steel Co. v. Cherry, Bekaert & Holland*,
   322 N.C. 200 (N.C. 1988) ...........................................................................33

*Reid v. Angelone*,
   369 F.3d 363 (4th Cir. 2004) ......................................................................22

*Self-Help Ventures Fund v. Custom Finish, LLC*,
   199 N.C. App. 743, 682 S.E.2d 746 (2009) ...............................................36

*Spartan Leasing, Inc. v. Pollard*,
   101 N.C. App. 450, 400 S.E.2d 476 (1991) ..........................................48, 49

*Synovus Bank v. Coleman*,
 887 F. Supp. 2d 659 (W.D.N.C. 2012)...........................................37

*Synovus Bank v. Karp et al.*,
 887 F. Supp. 2d 677 (W.D.N.C. 2012)................................40, 42, 49

*Tanglewood Land Co. v. Byrd.*,
 299 N.C. 260, 261 S.E.2d 655 (1980) ...........................................36

*Timmerick v. Munn*,
 433 F. Supp. 396 (N.D. Ill. 1977).............................................25, 26

*Tradewinds Airlines v. C-S Aviation Services*,
 733 S.E.2d 162 (N.C. Ct. App. 2012)............................................38

*US for Use and Benefit of Williams Elec. v. Metric Constructors*,
 325 S.C. 129, 480 S.E.2d 447 (1997) ............................................37

*Whisnant v. Carolina Farm Credit*,
 204 N.C. App. 84, 693 S.E.2d 149 (2010) .................................38, 39

*Winston Realty Co. v. G.H.G., Inc.*,
 314 N.C. 90, 331 S.E.2d 677 (1985) .............................................49

## STATUTES:

15 U.S.C.A. § 1701 *et seq.*..............................................................*passim*

15 U.S.C. § 1701(5) .......................................................................22

15 U.S.C. § 1701(6) .......................................................................22

15 U.S.C. § 1703 ......................................................................30, 31

15 U.S.C. § 1703(a)(2)....................................................................23

15 U.S.C. § 1703(c) ........................................................................30

15 U.S.C. § 1709 ............................................................................30

15 U.S.C. § 1709(a) ........................................................................30

vii

15 U.S.C. § 1709(b) ................................................................31

15 U.S.C. § 1709(c) ................................................................31

15 U.S.C. § 1713 ....................................................................31

28 U.S.C. § 1291 .....................................................................1

N.C.G.S. § 25-1-201(b)(20) ....................................................36

N.C.G.S. § 25-1-304 ...............................................................36

N.C.G.S. § 75 ............................................................18, 47, 51

S.C. Code Ann. § 36-1-203 .....................................................37

**RULES:**

Fed. R. Civ. P.12(b)(6).................................................5, 18, 19, 20

Fed. R. Civ. P.56 ....................................................................20

Fed.R.Civ.P. 56(c) ..................................................................21

**OTHER:**

113 cong. Rec. S315 (daily ed. Jan 12 1967) ........................................23

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the appeal under Title 28, United States Code, § 1291, which provides for an appeal from a final decision of a district court. This appeal was timely filed within thirty days of the entry of the district court's Judgment, Amended Judgment, and Memorandum and Order granting Plaintiff-Appellee's motion for summary judgment.

## ISSUES POSED BY THIS APPEAL

1.     Did the District Court err in dismissing the Appellants' counterclaims arising under the Interstate Land Sales Full Disclosure Act ("ILSA")?

2.     Did the District Court err in dismissing the Appellants' counterclaims for negligent misrepresentation?

3.     Did the District Court err in allowing the Appellee's Motion for Summary Judgment on its promissory notes?

4.     Did the District Court err in allowing the Appellee's Motion for Summary Judgment on Appellant K. Tracy's counterclaim for fraud?

5.     Did the District Court err in allowing the Appellee's Motion for Summary Judgment on Appellant K. Tracy's counterclaim for unfair commercial practices?

6.     Did the District Court err in allowing Appellee's Motion for Summary Judgment against Appellant Patricia Tracy?

7.    Did the District Court err in dismissing the counterclaims of Appellant Patricia Tracy based upon loan modification language?

## STATEMENT OF THE CASE

This case originates from collection actions filed by Plaintiff-Appellee Synovus Bank, as the successor in interest through name change and by merger with The National Bank of South Carolina ("Appellee," "Synovus Bank" or "Bank") against Defendants Kevin J. Tracy ("K. Tracy") and Patricia M. Tracy, now deceased ("P. Tracy" ).  The lawsuits were originally filed in the General Court of Justice for the State of North Carolina, Superior Court Division, Buncombe County, with the Bank seeking to recover on loans made to K. Tracy and P. Tracy (collectively, "Appellants," "the Tracys," or "the borrowers").  P. Tracy was the mother of K. Tracy.  Each of them borrowed funds from the Bank under separate promissory notes in order to finance the purchase of separate undeveloped lots in the River Rock Subdivision ("River Rock") located in Cashiers, Jackson County, North Carolina.  The Bank was offering special loan programs for River Rock purchasers.

On 15 September 2010, K. Tracy timely filed his notice of removal to the United States District Court for the Western District of North Carolina, Asheville Division. Joint Appendix ("J.A.") 41.  On 14 October 2010, P. Tracy timely filed her notice of removal. J.A. 121.  Thereafter, they filed responsive pleadings and

2

amended their respective answers to bring counterclaims against the Bank.  J.A.
184 and 227.   The Honorable Dennis L. Howell, United States Magistrate Judge,
consolidated these cases with several similar cases for all pretrial proceedings by
order entered on 10 December 2010. J.A. 209.  The consolidated cases all involved
the Bank seeking to recover on promissory notes or guarantees, with the Synovus
borrowers, including K. Tracy and P. Tracy (collectively with the other borrowers
in the consolidated action called "the Synovus borrowers") presenting defenses and
counterclaims.

On 31 January 2011 the Bank filed a motion to dismiss the counterclaims of
the Synovus borrowers, all of whom had purchased lots in River Rock.  J.A. 259.
The Synovus borrowers, including K. Tracy and P. Tracy, filed their responses in
opposition to the Bank's motion to dismiss on 2 March 2011. J.A. 363. The Bank
filed its reply on 11 March 2011. J.A. 417.

On 5 October 2011, Magistrate Judge Howell entered a Memorandum and
Recommendation recommending that the Bank's motions to dismiss be denied
with respect to the Synovus borrowers' claims for fraud and for violation of
Chapter 75 of the North Carolina General Statutes, but that the motions to dismiss
be granted on the Synovus borrowers' claims under the Interstate Land Sales Act
("ILSA"), under the North Carolina Mortgage Lending Act, and for common law
negligent misrepresentation.  J.A. 438, 467.  Further, Magistrate Judge Howell

3

concluded that P. Tracy had waived her counterclaims because she had executed documentation containing release and waiver language when renewing her loan. J.A. 350-355. Accordingly, Magistrate Judge Howell recommended that her counterclaims be dismissed. J.A. 463-467.

Both the Bank and the Synovus borrowers filed Objections to the Magistrate Judge's Memorandum and Recommendation. J.A. 470-503. On 15 August 2012, the United States District Court for the Western District of North Carolina, the Honorable Martin Reidinger, Judge presiding, entered an Order overruling the parties' Objections and adopting the Memorandum and Recommendation in its entirety. J.A. 551. The cases then proceeded to discovery.

After the completion of discovery, the Bank filed its motion for summary judgment on 1 July 2013. J.A. 626. The Synovus borrowers filed their consolidated response on 15 August 2013, J.A. 767, and K. Tracy and P. Tracy contemporaneously filed their case-specific memoranda. J.A. 845-854. The Bank filed its reply brief on 26 August 2013, J.A. 855, and gave notice of corrections to particular documents offered in support of its motion for summary judgment on 19 September 2013. J.A. 896. P. Tracy passed away and notice of her death was filed on 16 January 2014. J.A. 902.

On 21 January 2014, the District Court rendered its Memorandum of Decision and Order granting the Bank's Motion for Summary Judgment on the

remaining claims and defenses and entered Judgment accordingly. J.A. 904 and 943. Appellants, along with two other Synovus borrowers, timely filed their notices of appeal on 20 February 2014. J.A. 1026. The District Court awarded a stipulated amount of attorneys' fees on 24 February 2014, and filed the Amended Judgment on 25 February 2014. J.A. 1040. These matters of record are currently before the Court.

## STATEMENT OF THE FACTS

### A.    Synovus Purposefully Promoted Sales of River Rock Lots.

Appellants' ILSA and negligent misrepresentation claims are before the Court on appeal from an order of dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In that light, Appellants frequently cite to the pleadings, rather than to materials offered in connection with summary judgment motions, in setting forth factual statements. Appellants cite materials before the District Court at the motion for summary judgment stage where that is the better practice.

River Rock is a subdivision located in Cashiers, North Carolina, consisting of approximately 4,000 acres of undeveloped land. J.A. 155 at ¶6. The principal developer of River Rock was Legasus of North Carolina, LLC. ("Legasus"). The National Bank of South Carolina ("NBSC"), predecessor in interest to Synovus, loaned Legasus $12.5 million to purchase and develop River Rock. J.A. 155 at ¶8-

9.  For brevity's sake, this brief will typically refer to the banking entity as "Synovus" or "the Bank."  *See*  J.A. 69-91.

Legasus's ability to repay the Bank's acquisition and development loan was dependent upon future sale of lots in the River Rock development, including those sales financed by the Bank. J.A. 188 at ¶10.  The Bank actively promoted sales of the River Rock property and worked jointly with Legasus on these efforts, including by participating in development sales events and by creating a special lot loan program. J.A. 188 at ¶11 and J.A. 189 at ¶19.  The Bank provided acquisition and development lending to Legasus, then offered lot loans to purchasers.  These lot loans frequently structured as a "Lot Loan Program", (J.A. 843), by which the Bank would provide lot purchasers with short-term, interest only loans that were often 90% of the lot purchase price if the borrower agreed to pay 10% of the lot purchase price at closing to Legasus. J.A.  175 at ¶20.  This 10% down payment was then transferred at closing from Legasus to an account at the Bank in the borrower's name. *Id*. at ¶21.  These accounts were automatically debited each month to meet the interest payments, an arrangement which provided short term payment certainty rare in the banking industry. *Id*.  Additionally, the lot loan program is further described in Addendum "A" to the purchase contract.  J.A. 680.

To support this relationship, the Bank actively promoted the River Rock subdivision in ways exceeding its traditional role as a lender.  For instance, the

Bank attended sales events and made investment recommendations to purchasers for lots financed through the Bank.  J.A 189 at ¶¶18, 19.

Discovery bore out how close a relationship existed between Legasus and the Bank.  Indeed, the Bank's own promotional materials described it as an "affiliate" of Legasus.  J.A. 843.  The deposition of Michael Wolf, the Bank's loan officer most actively involved in promoting River Rock, goes to the heart of that relationship. Michael Wolf served as a Branch Manager at National Bank of South Carolina ("NBSC"), predecessor in interest to Synovus, from 2004 until 2006, when he became a commercial lender.  J.A.  802-3.

As part of his employment, he attended a number of events at River Rock during that time and after.  J.A.  813.  A regional executive, Walter Gayle, told Wolf that the Bank "had just done development loans and that they were in the process of cutting them out to lots and that we would participate in the lot sale." J.A.  814-15.   Mr. Gayle wanted Mr. Wolf to go to River Rock to lend money on individual lots.   J.A.  815-16.

A group from the Bank met with Bobbi Lane of River Rock at the development during its earliest stages.  J.A.  816.  They drove the property in an SUV.  *Id.*  Mr. Wolf was not aware of any recorded plats at the time.  *Id.*  He was not aware of utilities for individual lots or any plans to serve them with water and

7

septic.  J.A.  817-18.  The lots "weren't cut.  It was before any - - I mean, it was just land, raw land with roads."  J.A.  818.

In marketing the River Rock lot program, the flyer Mr. Wolf used contained the following heading:  "Affiliates Working Together To Make The Most of Your Lending Experience."  J.A. 843.  NBSC, Synovus, and River Rock logos are all featured together at the top of the flyer.  *Id*.  The Bank represented to potential purchasers that "We are excited and pleased to be a part of the development that is going on at River Rock."  *Id*.  The flyer established Mr. Wolf as the point of contact for the Bank over the "Lot Loan Program."  J.A. 843.  Mr. Wolf confirmed the contents of the flyer describing affiliate status.  J.A. 840.

The flyers were intended to attract business from people who wanted lot loans for the development.  J.A.  804.  Mr. Wolf stated that the flyer was "a promotional piece for the Bank."  *Id*. Flyers were "distributed at River Rock functions, along with the other banks that were there."  J.A.  804-5. Wolf's boss, Ronnie Colson, sent Mr. Wolf to promotional events to solicit business. J.A.  805-6.

> Q.    [By Mr. Webster]: When you handed this out with the packet of material at these promotional events, did you believe anything in this flyer was untrue?
>
> A.    No.
>
> J.A.  807.

> Q.  You don't deny that [Legasus and NBSC] were affiliates, right?
> You all used that word, and you said that there was nothing
> untrue in that Exhibit 1, right?
>
> A.  Based off the fact that we used that word in that particular
> thing, then yes, we are affiliates . . . .

J.A. 840.

The Bank created additional promotional literature bearing Legasus's logo, but containing the Bank's information.  It held out the financial services it was offering.  J.A. 895.  Once again, Mr. Wolf is designated as the Bank's representative "For Homesite and Construction Loans."  *Id.*

Mr. Wolf testified concerning his communication with borrowers at River Rock. He acknowledged telling borrowers that River Rock was a good investment. The following exchange occurred:

> Q.  Did you ever give potential borrowers advice regarding the
> purchase of a lot in River Rock as to whether or not it was a
> good investment?
>
> A.  Yes.
>
> Q.  Can you tell me about those instances?
>
> A.  I believe when we were talking about River Rock based off of
> the fact that we were doing the development loan, based off of
> the fact that we've had history with another development, that if
> everything came into place and people bought the lots and built
> houses, based off of the area that it was in, that it would be a
> good investment.
>
> Q.  Do you remember telling any particular person that type of
> thing?

A.    I believe it was somewhat of a standard spiel.

Q.    So when you were talking to a potential borrower about getting a loan to potentially purchase a lot in River Rock, that's the type of thing you would say?

A.    And they would ask me - - you know generally they weren't from the area.  They would ask me about the area, the area being Cashiers, the area being Highlands.  At the time, the properties were highly sought, that the understanding of what we were trying to accomplish in having people buy the lots and then build the houses, build a golf course, build the amenities, that it would be down the road a very nice place to be.

Q.    And a good investment.

A.    And a good investment.

J.A.  811-12.

He testified further concerning his promotional efforts:

Q.    What did you base your spiel on that if the things happened that you described that - -

A.    Common sense.

Q.    - - that this would be good investment?

A.    Common sense.

Q.    Okay.  And what was the common sense that led you to that conclusion?

A.    Common sense would be if you bought a lot in River Rock and you built a house in River Rock, that eventually that place would become worth something more than when you started . . . . J.A. 814.

When examined about some of the matters that were required to get a River Rock lot to the point of being able to build a house, he professed a lack of knowledge. He was not aware of any utilities to serve lots once they were platted. J.A. 818. When making a loan on a lot, he did not know if water and septic were approved. *Id.* His testimony about the condition of the lots continued:

> Q.    When you gave the spiel to potential borrowers, did you consider whether or not it would be important to know whether there were utilities for those lots?
>
> A.    Not at the time. Because they had already gotten the contract on the particular property, on the particular lot.
>
> Q.    So what if they couldn't dig a well - - drill a well?
>
> A.    At the time I didn't consider that.
>
> Q.    And what if the soils were not suitable for an on-site sewage disposal system?
>
> A.    That's not my area of expertise.
>
> Q.    Well, wouldn't it have affected the value of the collateral if you couldn't build a home on it?
>
> A.    I'm not sure. That was for somebody else to come up with.
>
> Q.    Well, isn't it common sense that if you can't serve a lot with utilities for the disposal of waste water and for the provision of potable water that it was going to affect the value of the lot? . . .
>
> A.    Sure. J.A. 818-19.

Mr. Wolf was aware of the Bank filling out credit applications on behalf of borrowers based on telephone information. J.A. 836-37. When Mr. Wolf made

statements to borrowers about whether or not River Rock was a great investment, he had not done any investigation as to whether there were utilities that would serve the lots against which the borrowers were borrowing hundreds of thousands of dollars. J.A. 841. In connection with making statements about a particular lot being a great investment, he did not investigate whether it could be built on, did not investigate the lot regarding the soils, regarding the ability to serve a lot with potable water, regarding whether steep slopes would render construction impermissible, or regarding zoning or subdivision ordinances. J.A. 842.

Mr. Wolf testified concerning lending guidelines that are found in bank documentation, including the appraisal review form, J.A. 844. The Bank deviated from its loan to value ratio requirements by lending at 90% loan to value on raw land in the River Rock development. J.A. 820, 822. At the time, Mr. Wolf did not compare the 90% loan to value deviation to FDICIA guidelines, and did not look at them, although they were on a document containing his signature J.A. 844, 821-22. Mr. Wolf did not understand that 90% loan to value was an exception to general guidelines for only going to 65% loan to value on raw land. J.A. 820.

Mr. Wolf picked Marilyn McCoy Woods to appraise lots from a list provided by the developer. J.A. 823. The Bank provided Ms. Woods with a purchase contract which identified the property to be appraised. J.A. 825. The contract would also serve the function of informing the appraiser of the value

12

needed by the Bank for the loan, i.e. an appraisal that would need to meet or exceed the contract price. *See* J.A. 310. Once Ms. Woods performed an appraisal for the Bank that equaled the contract price, Wolf used Ms. Woods exclusively. J.A. 826. Ms. Woods always submitted appraisals that at least equaled the contract price. J.A. 824-25.

Mr. Wolf understood the lot loan program as being one where a buyer put 10% down and, at the time of closing, the developer gave back enough money to make interest payments for 12 months. J.A. 827. He was concerned that the borrower would not understand that there was "a 12-month period where somebody else was making the payment." J.A. 827-28. The borrowers were essentially getting their down payment back. J.A. 829. It worked out to 100% loan to value, assuming the appraisals were correct. J.A. 830.

Mr. Wolf discussed monthly payments with borrowers, but not the balloon payments. J.A. 832-33. Generally speaking, the Bank would refinance loans as they became due. J.A. 834. Mr. Wolf advised borrowers that they could get their loans refinanced as balloons came due, whether with a construction loan to build on the lot or by extending the loan. J.A. 835. He advised borrowers that refinancing was a likelihood based upon the Bank's policy. *Id.* However, the Bank would not finance land for a period of 30 years because it was speculative and risky. J.A. 838-39. Mr. Wolf acknowledged that banks are permitted to loan

money based upon the amount of deposits they had. J.A. 831.  They maintain a

fractional reserve and deposits represent a reserve of the total amount they are

allowed to lend.  *Id.*  The more deposits a bank has, the more money it can lend.

*Id*.

Mr. Wolf had production targets, and was also aware of production targets

for particular groups, such as loan officers as a whole.  *Id.*  His compensation

included a production-based bonus, which could run as high as 10% of his annual

compensation. J.A. 809-10.  Performance bonuses were tied to production of

investments, loan products, insurance, and deposit accounts. J.A.  811. He was

terminated from employment at Synovus Bank in 2012 due to production issues.

J.A. 813.

### B.    Synovus Promoted the Sale of River Rock Lots to Kevin Tracy

As with the other borrowers, K. Tracy and P. Tracy acquired land in River

Rock financed through the Bank and purchased in reliance on Mr. Wolf's

representations.  K. Tracy purchased a lot in the River Rock development. His

decision to do so was based upon the actions of the Bank. His contract for sale was

executed on 12 November 2006 with a closing occurring on or about 14 December

2006, the date of his loan.  J.A. 316 and 320.

In connection with that closing, K. Tracy executed a promissory note to the

Bank secured by a deed of trust on 14 December 2006 in the River Rock

subdivision.  J.A.  320.  His decision to do so was based  upon his communications

with  Mr. Wolf of the Bank.   As he testified in his deposition:

> Q.    [by Mr.] . Tell me what else you remember about those first
> two or three calls that pertained to the property itself instead of
> the loan.

> A.    Basically, the – [Michael Wolf] reiterated on a number of
> occasions that it was a great investment and -- whether it was
> that call or another call, and that if I didn't buy, somebody else
> would.

> Q.    Anything else you remember Mr. Woods saying to you –
> excuse me, Mr. Wolf saying to you in your discussions prior to
> December 14, 2006 about the property itself other than what
> you just told me?

> A.    No. Primarily, you know, he reiterated on the same thing, that it
> was a great investment, and then -- we did talk about stuff that's
> more banking oriented about -- because of my concerns with
> the 36-month term on it. I mean, one kind of leads into the
> other. As we were talking about the property -- because when I
> got concerned about the loan, that's when he reinforced --
> basically he was reinforcing what I was getting from the sales
> team down there, that this was a great investment, properties
> were -- excuse me, from the sales projection, they were way
> ahead of -- they were ahead of their projected goals to begin
> with. J.A. 846.

> Q.    So we get into -- so that discussion you had, I think you said,
> sometime in October with Mr. Wolf was, Look, this is a 36-
> month loan term. You know, I can't afford to pay the carrying
> costs on that loan after it matures, and he said -- is that right?

> A.    That's correct.

> Q.    And he said, Well, you're going to sell this lot before that so
> you don't need to worry about it?

A.    Yes.

Q.    And Mr. Wolf -- you had already told Mr. Wolf that that was your intention, was actually to sell it within 18 months, right?

A.    Yes. J.A. 846-47.

Based on these facts, Mr. Tracy decided to move forward with his purchase. J.A. 179 at ¶61. But for this encouragement from the Bank, he would not have done so. *Id.* Wolf also failed to disclose to Mr. Tracy that the standard loan-to-value ratio on raw land was a maximum of 65%. J.A. 822, 844. There is no evidence that Mr. Tracy received the HUD Property Report prior to closing as required under the Interstate Land Sales Full Disclosure Act, discussed below.

### C.    Synovus Promoted the Sale of River Rock Lots to Patricia Tracy.

Patricia Tracy purchased a lot in the River Rock development. Her decision to do so was based upon the actions of the Bank. Her agreement to purchase was executed on 14 October 2006 with a closing occurring on 16 November 2006. J.A. 339. In connection with that closing, P. Tracy executed a promissory note to the Bank secured by a deed of trust on 16 November 2006 in the River Rock subdivision. J.A. 339. Her decision to do so was based upon her communications with Mr. Wolf of the Bank. As she testified in her discovery responses:

> 7/06: I contacted Michael Wolf by phone from my home in Maryland regarding the purchase of a lot in River Rock. Michael stated this was a "great investment" and that we were getting in early and that he had spoken with my sons. He also said most people were taking the 10% down, 10 months no-payment plan and that he would send paperwork

16

that day. 8/06: I sent the pre-qualification paperwork to Michael Wolf and the loan was approved. 10/06: In a telephone call to Michael Wolf, I told him that I was very concerned about the terms of the 36 month balance due. I let him know I was purchasing this lot as an investment and planned to resell. He told me not to worry as this was a "great investment" and the balance due was not an issue if sold early, and there was no penalty for pre-payment. * * *I was concerned about the maturity date and balance due on the note, but Michael Wolf told me not to worry since I planned on selling the lot prior to the note coming due with no pre-payment penalty. J.A. 854A.

Based on these facts, Ms. Tracy decided to move forward with her purchase. J.A. 254 at ¶112. But for this encouragement from the Bank, she would not have done so. *Id*. Wolf also failed to disclose to Ms. Tracy that the standard loan-to-value ratio on raw land was a maximum of 65%. J.A. 822, 844. Further, there is no evidence that Ms. Tracy received prior to closing the property report required under the Interstate Land Sales Full Disclosure Act. P. Tracy paid for the appraisal, but was never provided with a copy prior to closing. J.A. 238 at ¶ 26.

## SUMMARY OF ARGUMENT

Defendant-Appellants ("the borrowers") purchased separate lots in the River Rock subdivision in Jackson County, North Carolina from an entity known as Legasus. They borrowed funds from Plaintiff-Appellee Synovus Bank ("the Bank") to do so. The subdivision collapsed and the borrowers' short-term loans that the bank promoted came due. The Bank sued the borrowers on the notes. The borrowers counterclaimed for violation of the federal Interstate Land Sales Act ("ILSA"); for violation of state legislation governing unfair commercial practices,

17

codified at Chapter 75 of the North Carolina General Statutes; and for common law fraud and negligent misrepresentation.

The District Court dismissed the ILSA and negligent misrepresentation claims at the Rule 12(b)(6) stage. It allowed the Bank's motion for summary judgment on its collection claims and on the borrowers' fraud and unfair commercial practices counterclaims. The borrowers appealed.

The borrowers ask this Court to examine the rights and duties of the parties in connection with the Bank's promotion of the high risk subdivision that it knew or should have known was on the verge of collapse; its lending activities geared toward short term profits; its promotion of lot sales to receive repayment on its acquisition and development loan to the developer and to generate new lot loan business; and the representations it made and the advice it gave to the borrowers who were interested in purchasing and financing lots.

The Bank's promotion activities included holding itself out as an affiliate of the developer and encouraging people to purchase lots to be financed through the Bank. These promotional activities were accompanied by advice to the borrowers about the quality of the lots as investments. In taking these actions, the Bank stepped out of its traditional role as a lender and became liable for development activities under ILSA. Moreover, by undertaking an advisory role, while misrepresenting facts and circumstances to the borrowers, the Bank assumed and

breached legal duties to the borrowers, making it liable for negligent misrepresentation. The borrowers respectfully request that the order allowing the Bank's motion to dismiss these claims be reversed.

In addition, the borrowers presented genuine issues of material fact on their fraud and unfair commercial practices claims. The bank fraudulently induced the borrowers to execute promissory notes based upon the misrepresentations that the Bank's agent made when encouraging the borrowers to buy and borrow against lots. These facts defeat the claims on the notes at the summary judgment stage, and are of a nature that the borrowers should be allowed to proceed to trial on these claims. The borrowers respectfully request that the order allowing the Bank's motion for summary judgment on these claims be reversed.

## ARGUMENT

## STANDARD OF REVIEW

The District Court's decisions to dismiss K. Tracy's ILSA and negligent misrepresentation claims, and all of P. Tracy's claims, require review under standards applicable to orders allowing motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The District Court's decision to allow the Bank's motions for summary judgment on its promissory notes and on K. Tracy's fraud and unfair commercial practices claims requires review under standards

applicable to orders allowing motions for summary judgment under Rule 56 of the

Federal Rules of Civil Procedure.  The standards are set forth separately below.

### A.    <u>Review of Rule 12(b)(6) Orders.</u>

This Court reviews a district court order granting dismissal under Rule

12(b)(6) *de novo*.  *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.

1993).

> In general, a motion to dismiss for failure to state a claim should not
> be granted unless it appears certain that the plaintiff can prove no set
> of facts which would support its claim and would entitle it to relief.
> In considering a motion to dismiss, the court should accept as true all
> well-pleaded allegations and should view the complaint in a light most
> favorable to the plaintiff.

*Id.* (citing *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991)) .

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct.

1955 (2007). To be "plausible on its face," a plaintiff must demonstrate more than

"a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678,

129 S. Ct. 1937.  A complaint challenged by a motion to dismiss under Rule

12(b)(6) does not need detailed factual allegations, but rather must contain factual

allegations that raise a right to belief beyond a mere speculative level.  *Twombley*,

550 U.S. 544 at 555.

20

### B.     Review of Summary Judgment Orders.

This Court reviews a district court order allowing summary judgment *de novo*. *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993).

> The legal standard by which this Court reviews the district court's grant of summary judgment is *de novo*. Therefore, this Court is constrained to review the record under the same standard by which the district court was bound. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127–28 (4th Cir. 1987). Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c) *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *McKinney v. Board of Trustees*, 955 F.2d 924, 928 (4th Cir. 1992). In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney*, 955 F.2d at 928; *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). In making our determination under this standard, we must draw all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S. Ct. 1348, 1356–57, 89 L. Ed. 2d 538 (1986); *McKinney*, 955 F.2d at 928.

*Id.* at 214.

## DISCUSSION

## I.     THE DISTRICT COURT ERRED IN DISMISSING THE ILSA COUNTERCLAIMS.

### A.     The Basis for the District Court's Decision Was Erroneous.

When considering the ILSA claims, the District Court held that the Tracys failed to allege specific facts demonstrating that the Bank was acting as a

21

developer or agent. The District Court erred in making that ruling. The well pled

allegations of the borrowers' counterclaims, taken as true, show ILSA violations.

Accordingly, the District Court erroneously dismissed the ILSA counterclaims and

this Court should reverse the decision of the District Court.

### B.    The Bank Was a Developer Under ILSA.

The Bank stepped out of its ordinary role of analyzing risk and providing

loans to borrowers to engage directly in the sale of lots at River Rock.  Its actions

in actively promoting the sale of lots in River Rock render it a "developer" or

"agent" of the developer under the plain meaning of those terms as defined by

ILSA.

The terms "developer" and "agent" are defined under ILSA as follows:

"developer" means any person who, directly or indirectly, sells or
leases, or offers to sell or lease, or advertises for sale or lease any lots
in a subdivision" (15 U.S.C. § 1701(5)); "agent" means any person
who represents, or acts for or on behalf of, a developer in selling or
leasing, or offering to sell or lease, any lot or lots in a subdivision; but
shall not include an attorney at law whose representation of another
person consists solely of rendering legal services.

15 U.S.C. § 1701(6).  When interpreting ILSA, the Court starts by examining its

plain language and by giving the relevant terms their "common and ordinary

meaning." *Reid v. Angelone*, 369 F.3d 363, 367 (4th Cir. 2004), quoting *Mapoy v.*

*Carroll*, 185 F.3d 224, 229 (4th Cir. 1999).

In the case of *In re Total Realty Management*, 706 F.3d 245 (4th Cir. 2013) this Court was called to address whether liability under the Interstate Land Sales Act extends to entities that were not a party to a challenged real estate transaction but who were alleged to have engaged in fraudulent advertising or marketing activities in the course of that transaction. *Id.* at 251. In ruling affirmatively, this Court recognized the vital consumer protection goal that ILSA should " 'be read broadly to effectuate' its goal of 'protect[ing] purchasers of land which is part of a common promotional scheme.' " *Id.* (citing *Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir. 1991).

As it analyzed the statutory framework for a claim under ILSA, this Court concluded that "the legislative history of the statute does not support limiting liability under Section 1703(a)(2) to sellers." *Id.* at 252. It described the purpose behind ILSA as follows:

> The Interstate Land Sales Act was enacted in 1968 during the rapid expansion of the interstate land sales industry and in response to a number of high-profile cases of misleading and fraudulent marketing and sales of properties to out-of-state buyers, particularly retirees. *See* 113 cong. Rec. S315 (daily ed. Jan 12, 1967)(statement of Sen. Williams). In introducing the bill, Senator Williams noted that the bill was intended to broadly address the "promotion" of land sales across the state lines because out-of-state buyers generally rely on 'what they are told in advertising, **telephone conversations, sales parties and by salesmen..."** *Id.,* **indicating that congress was just as concerned with the promotion and advertising of properties as it was with the selling of properties.**

23

*In Re Total Realty Management, LLC*, 706 F.3d at 253. The Court summarized the general rule under ILSA that "parties can be held liable under [ILSA] as 'developers' if they are engaged in the sales and marketing of a development, even if they are not sellers." It went on to cite *Nahigian v. Juno Loudoun, LLC,* 684 F. Supp. 2d 731, 746-47 (E.D.Va. 2010), where the United States District Court for the Eastern District of Virginia determined that a party, other than a seller, could be held liable for lending its name to a development's marketing materials and participated in marketing efforts. *Id.*

The *In Re Total Realty Management* case specifically looked at precedent arising out of to the banking context in assessing liability as well. It quoted with approval *Hammar v. Cost Control Marketing & Sales Management of Virginia,* 757 F. Supp. 698 (W.D. Va. 1990), holding that a lender which closely aligned itself with a developer on a project was liable under ILSA:

> [In *Hammar*], the United States District Court for the Western District of Virginia held that a bank could be held liable as 'developer' under the Interstate Land Sales Act, even though it had not sold the properties at issue, explaining that '[w]hen a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort.' *Id*. at 702-03." *In re Total Realty Management*, 706 F.3d at 253.

*Hammar* is particularly instructive on lender liability under ILSA. There, the district court had occasion to consider a defendant bank's pre-discovery summary judgment motion where the bank argued that it should be granted

24

summary judgment because it was not a "developer" under ILSA. *See Hammar v. Cost Control Marketing & Sales Management, Inc.*, 757 F. Supp. 698, 703 (W.D. Va. 1990). The court there noted that ILSA is "to be liberally construed to effectuate its remedial purpose." *Id*. at 706. The court also noted that the Act has been, "construed to include all of those engaged in the selling effort" including "banks whose involvement with developers exceeds their ordinary course of business." *Id*.

*Hammar* provided guidance on what is to be considered a bank's "ordinary course of business" by stating that a bank that

> Merely finances various lot sales and has no involvement in the development, marketing, or sale of the land unless foreclosure becomes necessary, is certainly acting in the ordinary course of business. Commercial banks lend money. They analyze the risk, make the loan, and keep their hands off the subject of the loan unless trouble starts to brew. That is their ordinary course of dealing. Commercial banks are not in the business of developing or marketing real estate.

*Id*. at 702. Of particular significance, *Hammar* cited *Timmerick v. Munn*, 433 F. Supp. 396 (N.D. Ill. 1977), which recognized that a bank can exceed its ordinary course of dealing by holding itself out as a financial backer of a subdivision development. *Hammar*, 757 F. Supp. at 702.

*Timmerick* concluded that there are occasions where plaintiffs should be permitted to prove that a bank exceeded the normal course of business by actively participating in or aiding in the perpetration of the fraud or acting in such a manner

as to assist in the "luring of purchasers for an allegedly dubious project." *See Timmerick*, 433 F. Supp. at 406. The *Timmerick* Court, therefore, concluded that the bank had an interest in the success of the development and in the sale of the lots to qualified buyers since it would thereby make profitable loans secured by the real estate. *Id*. The *Timmerick* court reached a similar conclusion as the *Hammar* court, which denied the defendant bank's pre-discovery Motion for Summary Judgment and stated that, "[t]he plaintiffs should have the opportunity for full discovery" on the factual question of whether or not the bank could be considered a developer. *Hammar*, 757 F. Supp. at 703.

Especially in light of *In Re Total Realty Management*, the decision of the District Court in this case should be reversed and the case allowed to proceed. Given the plain meaning of the definition of "developer" within ILSA, it is apparent that the Bank, through its employee Michael Wolf, acted as a "developer" by participating "directly or indirectly" in the sale of lots in River Rock. It did so both through Mr. Wolf's actions and through the statements that he made to the borrowers.

The borrowers have pled in their counterclaims that the Bank improperly participated in the sales and marketing efforts of the developer. They had not then had the benefit of any discovery, but nonetheless sufficiently alleged that Wolf's participation in the sales events and his advising them by phone not to worry about

26

their loan concerns because the property would sell prior to maturity is more akin to being a "salesman" for the developer rather than a neutral banker. Mr. Wolf crossed the line and violated ILSA by promoting the sale of the property as described in the Statement of Facts. Wolf pushed sales and opened up direct payment accounts with closing proceeds transferred back to buyers at closing. The intent and result were that (a) the sale would pay down the bank's development loan, (b) the sale would result in a new lot loan and a new deposit, and (c) Wolf's bonus income, which was tied directly to the volume of loans and deposits he generated, would increase.

These reasons are precisely why Wolf went out to the development, toured the property, went to development sales parties, distributed promotional material tying the Bank directly to the development as an "affiliate" and "participant" in the development, and gave what he acknowledged as "advice" to buyers in his "standard spiel." This promotion included that the purchase was a good or great investment because the Bank was invested in the development's success by holding the development loan, because the Bank had prior experience with another of Legasus developments which would build developer confidence, and because of the lot loan program, developer funds would come back to them at closing to cover the loan payments. This is the conduct of a developer salesman, not a banker. When buyers voiced real concerns about the risk of taking out the loans, he told

27

them not to worry because the property would sell prior to maturity or would be refinanced by the Bank at maturity as a matter of bank policy.

Banks that traditionally have nothing to do with development sales do not go to such lengths to market or promote the sale and get it to the closing table. And, because the Synovus borrowers were out-of-state residents  --  people particularly subject to the protection of the "Interstate Land Sales Act"  --   the representations by Wolf in telling them that the purchase was a good investment and not to worry about their loan concerns because the property would be sold prior to maturity caused them to trust Wolf and validated the information received from the sales teams.

In fact, discovery on the remaining claims showed that the Bank went far beyond lending parameters in other ways. It confirmed, rather that refuted, the Tracy allegations about the representations Mr. Wolf made. Not only did the Bank refer to itself as an "affiliate" with River Rock on the promotional flyer, it specifically stated that it was a participant in the development and designated Mr. Wolf as the point of contact over the Lot Loan Program. The Bank held itself out on promotional materials bearing Legasus' logo that described its preferred lending programs. J.A. 895. Wolf even went so far as to warn K. Tracy that if he did not move on the lot, someone else would purchase it. J.A. 846-47.

Ultimately, the borrowers have alleged sufficient facts to support their claim that the Bank was a "developer" or "agent" of the developer under ILSA and thus should be given the opportunity to conduct full discovery on the factual question of whether the Bank could be considered a "developer" under ILSA. Especially where the District Court had stated at the motion to dismiss stage that the borrowers "have not produced advertising material suggesting the Bank may be an 'affiliate' of the Developer," J.A. 579, the procedural error is drawn into sharper relief.  The motion to dismiss should have been denied and the claim allowed to proceed, as allegations, not evidence is required on motion to dismiss.

**C.     Because of the ILSA Violations, the Borrowers Were Entitled to Cancel their Contracts and Are Entitled to Recover Damages from the Bank.**

The borrowers have a statutory right to revoke the purchase contract under ILSA and to recover damages both from Legasus (were it still in business) and from the Bank as its co-developer or agent.  In fact, the borrowers could have exercised these rights with their eyes open had the Bank been truthful.  The borrowers should be allowed that opportunity upon reversal of the District Court.

ILSA, codified at 15 U.S.C.A. § 1701 *et seq.*, applies to River Rock because the development exceeded 100 lots offered in interstate commerce and fell within no other statutory exceptions.  The legislation requires a developer in this situation to provide a property report to prospective purchasers:

29

### § 1703. Requirements respecting sale or lease of lots

**(c)    Revocation of contract or agreement at option of purchaser or lessee where required property report not supplied.**

In the case of any contract or agreement for the sale or lease of a lot which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).  In addition to the revocation or rescission remedy as set forth above, a purchaser is entitled to other civil remedies for violations of ILSA.  § 1709 of ILSA provides as follows:

### § 1709. Civil liabilities

**(a)    Violations; relief recoverable**

A purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable. In determining such relief the court may take into account, but not be limited to, the following factors: the contract price of the lot or leasehold; the amount the purchaser or lessee actually paid; the cost of any improvements to the lot; the fair market value of the lot or leasehold at the time relief is determined; and the fair market value of the lot or leasehold at the time such lot was purchased or leased.

**(b)     Enforcement of rights by purchaser or lessee**

A purchaser or lessee may bring an action at law or in equity against the seller or lessor (or successor thereof) to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title.

**(c)     Amounts recoverable**

The amount recoverable in a suit authorized by this section may include, in addition to matters specified in subsections (a) and (b) of this section, interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot.

The above remedies are in addition to any and all other rights and remedies that may exist at law or in equity pursuant to 15 U.S.C. § 1713.

A buyer can invoke these ILSA remedies unilaterally or through legal process when a developer fails to disclose objectively material information in a property report prior to the buyer executing a purchase agreement.  *Nahigian v. Juno-Loudoun, LLC*, 677 F.3d 579, 585-86 (4th Cir. 2012).  Because the borrowers did not receive a property report, and their communications with Mr. Wolf about the development were well within two years of his signing a contract to purchase, they had the right to rescind before closing.  Had the Bank told the truth about River Rock, the borrowers would have had good reason to avail themselves of the right to rescind.  Yet, because the Bank misrepresented those facts, the borrowers closed on the sales and the borrowers sustained damages as a result.

Moreover, even with Legasus out of business, the Bank is not excused from liability. The borrower can recover from the Bank the damages proximately caused by its violations of ILSA. As shown in Section I.B, above, the Bank is liable independently of what Legasus did.

## II. THE DISTRICT COURT ERRED IN DISMISSING THE COUNTERCLAIMS FOR NEGLIGENT MISREPRESENTATION.

When considering the negligent misrepresentation claims, the District Court held that the borrowers' allegations do not support a finding of any type of special relationship between Synovus Bank and the borrowers beyond that of the typical lender-borrower relationship. J.A. 581. The District Court erred in entering its ruling.

K. Tracy and P. Tracy have stated claims for negligent misrepresentation. The Bank, through its employee, Michael Wolf, made numerous actionable statements upon which the borrowers relied to their detriment. Under North Carolina law, "the tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d 465, 478 (N.C. Ct. App. 2009). Moreover, the North Carolina Supreme Court has adopted the Restatement Second view of the tort of negligent misrepresentation as follows:

> [o]ne who, in the course of his business, profession or employment, or
> in any other transaction in which he has a pecuniary interest, supplies
> false information for the guidance of others in their business
> transactions, is subject to liability for pecuniary loss caused to them
> by their justifiable reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or communicating the
> information.

*Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 209 (N.C.

1988). The law is clear that an ordinary lender-debtor relationship does not give

rise to a fiduciary relationship and that lenders are generally obligated only to

perform those duties expressly provided for in their loan agreements. *See Branch*

*Banking and Trust Co. v. Thompson*, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992);

*See also Camp v. Leonard*, 515 S.E.2d 090, 913 (N.C. Ct. App. 1999).

Nevertheless, the *Branch Banking and Trust Co.* court noted that some

exceptions to this general principle exist by stating, "[t]his is not to say, however,

that a bank-customer relationship will never give rise to a fiduciary relationship

given the proper circumstances." *Id.* at 699.

There was nothing ordinary about the Bank's relationship with the

borrowers, because the Bank's employee Michael Wolf undertook a duty to the

borrowers here by making certain statements to them ***prior*** to each the execution of

loan agreements with the Bank. The fact that the Bank subsequently entered into a

loan agreement with each of the borrowers does not alter the parties' relationships

for negligent misrepresentation purposes, as the Bank undertook a duty to each

33

prior to the execution of the loan agreements when the Bank's employee made false statements that had nothing to do with those loan agreements.  The Bank, therefore, cannot hide behind the existence of loan agreements that were executed after the actionable statements were made by the Bank's employee to the borrowers in order to immunize itself from liability for these negligent misrepresentations.

A legal duty arose in each of these cases when Michael Wolf made statements to the borrowers about their investments in purchasing lots at River Rock, including that purchasing a lot was a "good investment" or a "great investment."  When Mr. Wolf elected to make these statements and other statements before the Bank executed a loan agreement with the borrowers, a duty arose because he chose to occupy a position of special confidence and thus he was required thereafter to act in good faith and with due regard to the interests of the borrowers. *See Branch Banking and Trust Co. v. Thompson*, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992).  Further, Mr. Wolf used his position and knowledge of the development to ease the borrowers concerns about going forward with the loans prior to execution.  In response to their legitimate concerns, Mr. Wolf told them not to worry because the property would be sold prior to maturity.  These representations are sufficient to state a claim for negligent misrepresentations, especially since Mr. Wolf admittedly knew at the time he made his representations

to the Tracy borrowers that developer had done nothing to construct amenities and that the property was still raw land with cut roads despite record sales. The fact that the borrowers are out of state residents and looked to him for guidance during this process should bear heavily on this issue.

Ultimately, the borrowers have alleged with clarity that the Bank undertook a duty to them when its employee Michael Wolf made statements to the borrowers regarding their investments in River Rock prior to the borrowers entering into loan agreements with the Bank and purchasing lots in River Rock. Accordingly, the borrowers have stated claims for negligent misrepresentation and this Court should reverse the decision of the District Court and allow the negligent misrepresentation claims to go forward.

## III. THE DISTRICT COURT ERRED IN ALLOWING THE BANK'S MOTION FOR SUMMARY JUDGMENT ON ITS PROMISSORY NOTE CLAIMS.

When considering the Bank's claims on its promissory notes, the District Court held that the Bank presented sufficient evidence of the debt in order to receive a judgment, including attorneys' fees and that the borrowers failed to present sufficient evidence of fraud, as an affirmative defense, to defeat the Bank's claim. J.A. 936-939. The District Court erred in entering its ruling.

### A.    The Bank is Obligated to Act in Good Faith.

Rights arising under promissory notes are governed by the UCC.  *See Self-Help Ventures Fund v. Custom Finish, LLC*, 199 N.C. App. 743, 746, 682 S.E.2d 746, 748 (2009).  All UCC transactions include obligations of good faith.  "Every contract or duty within this Chapter imposes an obligation of good faith in its performance and enforcement."  N.C.G.S. § 25-1-304.  The definition of good faith is found in N.C.G.S. § 25-1-201(b)(20), which provides as follows:  "'Good faith,' except as otherwise provided in Article 5 of this Chapter, means honesty in fact and the observance of reasonable commercial standards of fair dealing."  "Implicit in every contract is the obligation of each party to act in good faith."  *Great American Ins. Co. v. C.G. Tate Const. Co.*, 303 N.C. 387, 400, 279 S.E.2d 769, 777 (1981).  "Whether a party has acted in good faith is a question of fact for the trier of fact."  *Bledsole v. Johnson*, 357 N.C. 133, 139, 579 S.E.2d 379, 382 (2003) (citations omitted).

The promissory notes on which the Bank is seeking summary judgment identify South Carolina law as governing the lending transactions. J.A. 321, 753.  *See, e.g.*, paragraph 18 on Ex. A to plaintiff's complaint against Katherine Williams.  According to *Tanglewood Land Co. v. Byrd.*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980), where the parties have agreed that a given jurisdiction's substantive law shall govern the interpretation of a contract, such a contractual

provision will be given effect.  This Court has applied that principle to suits on promissory notes.  *See Synovus Bank v. Coleman*, 887 F. Supp. 2d 659 (W.D.N.C. 2012).  Hence, as the promissory notes in this case are subject to South Carolina law, that comes into play in evaluating the propriety of summary judgment on the notes.

South Carolina has a similar statutory system to North Carolina.  S.C. Code Ann. § 36-1-203.  All contracts subject to South Carolina law contain an implied obligation of good faith and fair dealing.  *See US for Use and Benefit of Williams Elec. v. Metric Constructors*, 325 S.C. 129, 133, 480 S.E.2d 447, 448-49 (1997) (citations omitted) ("Clearly, fraud, misrepresentation and bad faith in the performance of one's contractual duties would give rise to a violation of the implied obligation of good faith and fair dealing.").

In light of these statutes and cases, a party such as the Bank is obligated to act in good faith in its dealings with other parties, such as the borrowers.  The Bank's deviation from that standard, when done in connection with the fraudulent actions described below, are the antithesis of good faith.

### B.    The Bank's Fraud Defeats Its Claims on the Notes.

As in *Synovus v. Coleman*, *supra*, evaluation of the Bank's tortious conduct is measured under North Carolina law, where the tort occurred.  *See Coleman*, 887 F. Supp. 2d at 669-70.  "Where an owner of land is induced by fraud or

misrepresentation to execute a mortgage which he would not have given if fully and truly informed of the circumstances, the fraud thus practiced on him will be fatal to the validity of the instrument." *Daniel Boone Complex v. Furst*, 43 N.C. App. 95, 103, 258 S.E.2d 379, 386 (1979). Fraud in the inducement is based upon a false representation or concealment of material fact reasonably calculated to deceive, made with the intent to deceive, and which does in fact deceive, resulting in damage to the injured party. *See Tradewinds Airlines v. C-S Aviation Services*, 733 S.E.2d 162, 168 (N.C. Ct. App. 2012). Where a contract is fraudulently induced, defenses based upon the fraudulently induced contract will not bar the claim. *See Id.* at 169. Parol evidence is admissible where there is fraud in the inducement that "vitiates the contract." *Id*. at 169-70 (citing *Laundry Machinery Co. v. Skinner*, 225 N. C. 285, 288-89, 34 S.E.2d 190, 192-93 (1945)).

In *Whisnant v. Carolina Farm Credit*, 204 N.C. App. 84, 693 S.E.2d 149 (2010), parties who executed loan documents as co-makers or sureties sued the lender for fraud, fraud in the inducement, and unfair and deceptive commercial practices because the lender did not share information it had about the principal borrowers' deep financial struggles in meeting their commitments to the lender. The North Carolina Court of Appeals reversed summary judgment in favor of the lender, allowing the plaintiffs to go forward with their case. The court stated as follows:

> In regard to [the lender's] contentions, we first note that plaintiffs need
> not allege defendant made an affirmative misrepresentation to them as
> "[w]here there is a duty to speak, fraud can be practiced by silence as
> well as by a positive misrepresentation" . . .  (citations omitted).
> Furthermore, [the lender] may have also had owed a duty to disclose
> to plaintiffs its knowledge regarding the Wilsons' and the greenhouse's
> financial state [as the parties to whom the plaintiffs were providing
> financial backing].

*Whisnant*, 204 N.C. App. at 91, 693 S.E.2d at 155 (citations omitted).  The

plaintiffs were therefore entitled to challenge the enforceability of the notes on

which they cosigned.

The same considerations apply here.  Evidence of the Bank's fraudulent

inducement of the borrowers to enter into financing and purchase agreements at

River Rock, a project being developed by a troubled borrower from the Bank,

deprives the Bank of the ability to recover on its notes at summary judgment.  The

Borrowers' remaining arguments on fraud, discussed below in connection with why

their claims should go forward, apply with equal force to their defense against the

Bank's suits on notes, and are incorporated by reference.

## IV.    THE DISTRICT COURT ERRED IN ALLOWING THE BANK'S SUMMARY JUDGMENT MOTION ON THE KEVIN TRACY COUNTERCLAIMS FOR FRAUD.

When considering the K. Tracy fraud claims, the District Court held that

Wolf's statements were merely expressions of opinion or puffery, J.A. 925, Wolf

believed his statements to be true, J.A. 925-26, and that no fact-finder could infer

that the borrowers actually relied upon these opinions.  J.A. 927.  The District

39

Court erred in entering its ruling on that claim, and for similar reasons, on the K. Tracy Unfair Commercial Practices claim.  To avoid unnecessary repetition, the key facts which apply to both claims are more fully developed in connection with the borrowers' discussion of unfair commercial practices below.  *See* Section V.

The District Court's earlier published opinion ruling on motions to dismiss in this case provides an overall framework through which to view the borrowers' claims.  There, the court denied the Bank's motion to dismiss various borrowers' claims as implausible.  It noted:

> [I]n the present case, the Defendants' allegations, when assumed to be true, establish a plausible reason (i.e., the desire for short-term profitability) for the Bank's willingness to knowingly make undercollateralized loans to the Defendants, even if such loans may have been, as argued by the Bank, contrary to the Bank's long-term financial interests.  Further, the Defendants have pled sufficient factual allegations detailing the basis of their claims against the Bank
>
> . . . .
>
> As the events of the recent economic crisis have demonstrated, financial institutions do not always make the most prudent business decisions, and they sometimes may accept what would otherwise appear to be unreasonable economic risks for the sake of immediate, short-term profitability . . . . Construing the well-pled factual allegations of the counterclaims in the light most favorable to the Defendants, the Court concludes that the Defendants have pled sufficient factual allegations in the Amended Counterclaims to state claims that are plausible on their face.

*Synovus Bank v. Karp et al.*, 887 F. Supp. 2d 677, 685-86 (W.D.N.C. 2012).  The same considerations continue to apply at summary judgment and on appeal.  The

Bank made lending decisions to promote short term profit rather than based on long term analysis.  The Bank's conduct followed suit, and its representations to the borrowers were designed to achieve these goals.

The Bank's statements about the value of the River Rock properties or the quality of investments are not "mere expression of an opinion or belief."  Rather, they are actionable as fraud.

### A.  Fourth Circuit and North Carolina Law Support the Borrowers' Claims.

In the aftermath of the real estate boom and the financial crisis that followed, courts have been called upon to address claims of financial excesses by lenders desiring to make loans.  In *McCauley v. Home Loan Investment Bank*, __ F.3d ___ 2013 WL 1189292 (4th Cir. 2013), this Court considered fraud claims that a borrower presented against a lender where the borrower's debt was secured by a real estate mortgage.  The borrower alleged that an inflated appraisal was used to misrepresent the value of the property for purposes of inducing her to enter into a contract to borrow.  Her allegations of fraud were sufficient under West Virginia law to state a claim, and the Circuit reversed the order of the District Court dismissing the action.

North Carolina law is similar.  Ruling on the Bank's motion to dismiss during this case, the District Court reviewed the elements of fraud.  A party must show a false representation or concealment of a material fact that: (1) was

41

reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. *Karp,* at 686. "Additionally, the party must demonstrate any reliance on the false representations was reasonable." *Id.*

Circumstances where one party has a marked advantage in access to information and induces another party to enter into a transaction based upon that disparity form the basis of many strong fraud cases. This situation is particularly true around real estate developments, where not only control over the appraisal process, but also access to additional information, places the seller or lender in a position of excessive power.

In *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a builder entered into a contract with a developer to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers lined up to buy homes that the plaintiff could build. The plaintiff was to be one of only two approved builders in the subdivisions. *Id.* at 430, 617 S.E.2d at 666. When the representations turned out to be false, the builder who bought the lots sued. The trial court allowed the developer's motion for summary judgment. *Id.* at 433, 617 S.E.2d at 668.

The North Carolina Court of Appeals reversed the summary judgment in favor of the developer on the plaintiff's fraud and unfair commercial practices claims. It considered matters such as reasonable reliance, possibility of inspection, and the disparity of information between the developer and the buyer. The opinion is highly instructive about allocation of responsibility in the real estate development context:

> Specifically, defendant contends plaintiff did not sufficiently allege that defendants made any alleged misrepresentations with knowledge of their falsity. While knowledge and intent must be alleged in the complaint, our Supreme Court has noted that it is sufficient if fraudulent intent may reasonably be inferred, presumed, or necessarily results from the facts alleged. *See Cotton Mills v. Manufacturing*, 218 N.C. 560, 562, 11 S.E.2d 550, 551 (1940). Such is the case where, as here, plaintiff alleged that only three homes were sold at the time Mikesh represented seven homes had been sold. In addition, plaintiff alleged Mikesh misrepresented, inter alia, that additional exclusive builders were needed because the current builder could not build homes fast enough and customers were "lined up and waiting to meet" plaintiff.

> Defendant also argues the trial court's summary judgment on plaintiff's claim of fraud must be upheld on the grounds that there was no misrepresentation regarding a past or existing material fact. Defendant's argument is manifestly in error with respect to [the developer] Mikesh's representation as to the actual number of sales which had already occurred in [the] Savannah [subdivision]. Mikesh's representations as to the current demand in Savannah likewise survive summary judgment under our Supreme Court's holding in *Ragsdale* [*v. Kennedy*, 286 N.C. 130, 138-39, 209 S.E.2d 494, 500-501 (1974)](disallowing summary judgment in favor of a president of a corporation who had peculiar knowledge of the facts and knew that the business had lost money, yet made positive representations that the corporation was a " gold mine" and a "going concern" on the grounds that it was a jury question as to whether such representations

43

were intended and received as expressions of opinion or statements of material fact).

Defendants next argue that summary judgment was appropriate because plaintiff "had [and availed itself of] the opportunity to independently investigate the viability of the Savannah project." Defendants cite *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C.App. 341, 346, 511 S.E.2d 309, 313 (1999) for the proposition that where one relies on a "misleading representation, [but] could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence."

"Even if there is no duty to disclose information, if a seller does speak then he must make a full and fair disclosure of the matters he discloses." *Freese v. Smith*, 110 N.C.App. 28, 35, 428 S.E.2d 841, 846 (1993). In replying to claims that a false representation was not justifiably or reasonably relied upon, our Supreme Court has stated that "[t]he law does not require a prudent man to deal with everyone as a rascal and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract [.]" *Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) (citations and quotation marks omitted). Our Supreme Court further elaborated that reliance may be unreasonable, but, in close cases, sellers intentionally and falsely representing material facts so as to induce a party to action "should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.' " *Id.* In another case, our Supreme Court examined a defendant's demurrer on the grounds that the plaintiffs "could have ascertained by an accurate survey of the lines and boundaries of the land whether [certain land with timber] was included" and determined that "the defendants cannot complain if the plaintiffs relied upon the defendants' positive representation ... that the timber on this parcel of land was a part of that being sold." *Keith v. Wilder*, 241 N.C. 672, 676, 86 S.E.2d 444, 447 (1955).

Based on the precedent laid down by our Supreme Court, we hold plaintiff's fraud claim is not barred on the grounds that plaintiff had some lesser opportunity to investigate the various representations

> made by [the developer] Mikesh, who possessed superior knowledge
> on such matters. Indeed, certain representations by Mikesh could not
> be readily or easily verified. Moreover, we hold, in light of the scope
> and nature of Mikesh's positive assertions and our standard of review,
> that defendants are not entitled, as a matter of law, to summary
> judgment on plaintiff's claim of fraud.

*Phelps-Dickson*, 172 N.C. App. at 437-439, 617 S.E.2d at 670-671.  These same

facts were sufficient to avoid summary judgment on the plaintiff's unfair

commercial practices claims.  *Id*., 617 S.E.2d at 671-72.

The decision in *Phelps-Dickson* illustrates why summary judgment should

not stand in this case.  Here, as there, the party promoting the sale of the lots,

whether the developer itself or a lender acting as its affiliate, knew about lot sales,

properties under contract, property values, and their investment potential (whether

to build and sell, or simply to sell). Here, as there, the party promoting the sale of

the lots, whether the developer itself or a lender acting as an affiliate,

misrepresented key facts about the quality and nature of the properties.  Here, as

there, the party promoting the sale of the lots, whether the developer itself or a

lender acting as an affiliate, fraudulently induced an innocent purchaser with much

less opportunity to know the true facts to procure the property.  Here, as there, the

party promoting the sale of the lots, whether the developer itself or a lender acting

as an affiliate, once undertaking the duty to speak, was required to be truthful.

Here, as there, reasonableness of reliance is a question of fact  – and not a question

which should be ruled upon as a matter of law before trial.  Here, as there, the

party promoting the sale of the lots is not entitled to judgment as a matter of law.

As in *Phelps-Dickson* the conduct of the Bank, in possession of

disproportionately greater information, misled the borrowers, much as the *Phelps-*

*Dickson* developer misled the contractor.

**B.    The *Village of Penland* Case Does Not Alter the Analysis.**

The District Court cited *Village of Penland* for the proposition that the

borrowers alleged reliance was misplaced because their relationship to the Bank

was merely contractual, and did not give rise to a fiduciary duty to ensure that the

borrowers were making a sound investment.  The District Court did not apply

*Village of Penland* correctly to the facts of this case.

In the case of *In re Fifth Third Bank, N.A.—Village of Penland Litigation*,

719 S.E.2d 171 (N.C. App. 2011), the North Carolina Court of Appeals considered

an action brought by two wealthy physicians who purchased twenty equally priced

lots in a prospective development.  *Id.* at 173-74.   The development failed,

indictments and guilty pleas followed, and the doctors and their lender took to the

courts.  *See id.* at 174.  The plaintiffs ultimately pursued two claims against the

lender:  unfair and deceptive trade practices and tortious action in concert and civil

conspiracy, which were decided at summary judgment.  *Id.*  Critical to the

resolution were the following facts:

46

> In making the decision to invest in the Village of Penland, Dr. Williams relied entirely on information provided by individuals and entities other than Defendant. Among other things, Dr. Williams repeatedly admitted that he had never spoken with any representatives of Defendant prior to deciding to invest in the Village of Penland, that he had not had any contact with Defendant prior to that point, that Defendant never made any representations that affected his decision to invest in the project, and that he "had no communication with anybody at [Defendant]" prior to making his investment decision. Dr. Williams acknowledged that Defendant had not been guilty of making any misrepresentations to him at any time.

*Id.* at 177. Given these undisputed facts, it is hardly surprising that the North Carolina Court of Appeals concluded that the two remaining claims in the litigation lacked merit. *Village of Penland* stands for a simple proposition: if a bank does nothing wrong (and indeed, nothing at all other than simply loaning money), it will not be liable. By contrast, the evidence here is far more substantial than the plaintiffs' complete lack of proof in opposing summary judgment in *Village of Penland*.

### C.    Other Factors Support the Fraud Claims Proceeding.

The Bank's active role in promoting the property and the way it promoted itself to the public, including the borrowers, supports liability. The Bank held itself out as an affiliate of the developer, and so broadened the scope both of its liability, and of the information upon which the borrowers can reasonably rely. This principle is discussed more fully in connection with the Chapter 75 arguments, described below.

### D.    Reasonable Reliance Elements are Satisfied.

This case is not a simple matter of "sales talk" and puffery.  The rules

governing conduct by a salesman who attempts to "puff up" his own product do not

extend to what a bank does with potential borrowers.  Mr. Wolf was not selling a

product that was not his own, but rather a product that was being offered by

another company altogether, through the words of a lender upon whose objectivity

the borrowers were relying.  As with the contractor in *Phelps-Dickson* who was not

required to test every statement of the developer, the borrowers here are not

required to test every statement of the lender.  They are not required to assume he

is a rascal, especially where borrowers typically believe that a lender's role is to

make loans, not sell lots  -  a role blurred by Michael Wolf and subjecting the bank

to  liability on multiple grounds.

## V.    THE DISTRICT COURT ERRED IN ALLOWING THE BANK'S MOTION FOR SUMMARY JUDGMENT ON THE KEVIN TRACY COUNTERCLAIMS FOR UNFAIR COMMERCIAL PRACTICES.

As with the fraud claims, the District Court's earlier opinion on motion to

dismiss frames the issues for the Chapter 75 claims:

> To state a claim for unfair and deceptive trade practices under Chapter
> 75, a party must allege sufficient facts to show "(1) an unfair or
> deceptive act or practice, or an unfair method of competition, (2) in or
> affecting commerce, (3) which proximately caused actual injury to the
> plaintiff or to his business." *Spartan Leasing, Inc. v. Pollard*, 101
> N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991). A deceptive
> practice is one that has "the capacity or tendency to deceive the

average consumer, but proof of actual deception is not required." *Id.*
at 461, 400 S.E.2d at 482.

The Bank argues that to the extent that the Defendants' claims are
based on allegations related to false appraisals, such allegations
should not be considered because these appraisals were conducted for
the benefit of the Bank and not the Defendants, and thus it was not
reasonable for the Defendants to rely upon them. Even if such
appraisals do not support the Defendants' Chapter 75 claims, however,
the Amended Counterclaims contain numerous other allegations of
what would constitute unfair and deceptive trade practices, such as
false representations regarding the value of the lots, the status of the
development at River Rock, and the ability of the Defendants to sell
their lots prior to the expiration of the loan term. As the Magistrate
Judge correctly recognized, each of these statements had the "capacity
to mislead" the Defendants and can thus constitute unfair and
deceptive trade practices. Moreover, "[p]roof of fraud necessarily
constitutes a violation of the prohibition against unfair and deceptive
acts." *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 97, 331 S.E.2d
677, 681 (1985). Because the Court has concluded that the Defendants
have stated plausible fraud claims with enough particularity to survive
the Plaintiff's Motion to Dismiss, the Court likewise will deny the
Motion to Dismiss with respect to the Chapter 75 claims. The Bank's
objection, therefore, is overruled. *Karp*, 887 F. Supp. 2d at 688.

Not only does the evidence of the Bank's fraud support the borrowers'

position, as proof of fraud is per se proof of a Chapter 75 violation, *see Phelps-*

*Dickson, supra*, but additional conduct by the Bank does as well.  The borrowers

are not required to show bad faith, deliberate acts of deception or actual deception,

but simply must show that the acts had a tendency or capacity to mislead.  *See*

*Spartan Leasing, Inc.*, 101 N.C. App. at 461.

When parties, including lenders, actively align themselves with developers,

to the point of calling themselves "affiliates", it expands the basis to hold them

49

accountable for shared undertakings with the developer.  As discussed in

connection with the borrowers' ILSA claims, close ties between real estate

development companies and lenders who exceed traditional lending roles and act

as developers, such as by promoting sales and holding themselves out as affiliates,

expands liability.  *See In Re Total Realty Management, LLC*, 706 F.3d 245 (4th

Cir. 2013), discussed above.

      Discovery has shown how closely the Bank aligned itself with the developer,

promoting River Rock as an investment, and holding out to the public (including

the borrowers here) that it was an affiliate of the developer. The District Court

concluded that the term "affiliate", as appearing in J.A. 843, was a reference to

NBSC and Synovus Mortgage Corp. and that there was no evidence suggesting

that any of the borrowers saw the flyer or were misled by it.  J.A. 934.  To the

contrary, the promotional flyer clearly links the Bank to the development at River

Rock by closely placing their logos together near the word "Affiliates."  Next, the

Court ignored the plain language of the flyer wherein the Bank specifically states

that "We are also excited and pleased to be a part of the development that is going

on at River Rock."  And, the Bank went on to designate Mr. Wolf as the point of

contact for the Lot Loan Program specifically created for the development.  J.A.

843.  The Bank further promoted its services as attributable to the developer in its

promotional literature bearing the Legasus logo as well.  These promotional

materials were specifically designed to lure buyers into believing that the Bank was closely aligned with the development unlike other lenders. The materials were designed to draw buyers to the Bank, rather than other competitors.

A determination of whether the Bank was an affiliate should be determined by what the Bank did, not what the borrowers knew. The conduct of the Bank was established prior to borrower involvement; therefore, what they knew or didn't know about the Bank's involvement in the development is immaterial.

Even if a jury were ultimately to conclude that the developer and lender were not affiliates—Mr. Wolf's testimony to the contrary notwithstanding—it is abundantly clear that those statements had the capacity or tendency to mislead under Chapter 75 of the North Carolina General Statutes, making the borrowers' reliance on what Mr. Wolf had to say all the more reasonable.

Summary judgment should be reversed. Kevin Tracy's communications with Mr. Wolf and reliance on those representations, based on Wolf's purported knowledge about the quality of the investment, show sufficient investigation of the property. Further, K. Tracy could have canceled the contract and avoided closing at various times, but instead he reasonably relied on his misrepresentations. He was not legally bound by the contracts where ILSA requirements had not been met and had an absolute right to rescind his purchase contract at any time.

## VI.   THE DISTRICT COURT ERRED IN ALLOWING THE BANK'S MOTION FOR SUMMARY JUDGMENT AGAINST PATRICIA TRACY.

As argued in this brief, P. Tracy's affirmative claims for relief should have been allowed to proceed.  Even though they were dismissed, the same circumstances would allow P. Tracy to avoid summary judgment on the bank's claims against her, as its own fraud and unfair commercial practices defeat its right to recover.  The legal standards set forth in connection with K. Tracy's claims are the same ones that apply to P. Tracy's defenses.  When the evidence on summary judgment is considered, she is entitled to an order of reversal.

P. Tracy's communications with Mr. Wolf and her reliance on his representations, based on Wolf's purported superior knowledge about the quality of the investment, show sufficient investigation of the property. Further, P. Tracy could have canceled the contract and avoided closing at various times, but instead she reasonably relied on his misrepresentations. The questions raised by the Bank, such as the credibility of Ms. Tracy's assertion that she relied on Mr. Wolf's representations, are classic jury questions.  J.A. 849.

## VII.   THE DISTRICT COURT ERRED IN RULING THAT PATRICIA TRACY WAIVED HER COUNTERCLAIMS AND DEFENSES.

The District Court erroneously dismissed the claims of Patricia M. Tracy based upon her having executed a purported waiver of her counterclaims and defenses. The enforcement of this purported waiver is contrary to the law and

public policy. Accordingly, the purported waiver is not enforceable against

Patricia M. Tracy and the District Court's judgment enforcing it should be

reversed.

In North Carolina, "releases which exculpate persons from liability for

negligence are not favored by the law." *Johnson v. Dunlap*, 280 S.E.2d 759, 763

(N.C. App. Ct. 1981); *Alston v. Monk*, 373 S.E.2d 463, 466 (N.C. App. Ct. 1988).

The Courts have routinely held that, "parties are free to allocate risk of injury by

means of exculpatory contracts, unless the subject matter of such contracts affects

a public interest." *Bertotti v. Charlotte Motor Speedway, Inc.*, 893 F. Supp. 565,

566 (W.D.N.C. 1995). Further, the North Carolina Supreme Court has stated,

> [a] provision in a contract seeking to relieve a party to the
> contract from liability for his own negligence may or may not be
> enforceable. It depends upon the nature and the subject matter of the
> contract, the relation of the parties, the presence or absence of equality
> of bargaining power and the attendant circumstances.

*Miller's Mut. Fire Ins. Ass'n. Parker*, 234 N.C. 20, 22 (N.C. 1951). The

Court added that, "the public interest is paramount. If the provision is violative of

law or contrary to some rule of public policy, it is void and unenforceable." *Id*.

Further, the courts have stated that, "[a]n activity falls within the public

policy exception when the activity is extensively regulated to protect the public

from danger, and it would violate public policy to allow those engaged in such an

activity to 'absolve themselves from the duty to use reasonable care.'" *Fortson v.*

*McClellan*, 508 S.E.2d 549, 551 (N.C. Ct. App. 1998) (quoting *Alston v. Monk*, 373 S.E.2d 463, 467 (N.C. Ct. App. 1988).

P. Tracy has alleged that the Bank acted as a "developer" or "agent" of the developer under ILSA and thus its actions are regulated by ILSA to protect the purchasers of lots from the very actions alleged in this case. Further, the lending industry is heavily regulated to protect the public from unscrupulous, deceptive or unfair actions by banks. The purported waiver at issue implicates a clear public interest, as banks throughout the United States should not be able to use documents drafted in conjunction with loan modifications and loan re-finances to insulate themselves from liability for the very actions that caused substantial damage to the United States economy and to numerous consumers throughout the country.

In this case of P. Tracy, Bank employee Travis Andrews told her that she either had to re-finance her loan or pay off the loan in full. J.A. 241 at ¶ 46]. Ms. Tracy believed that she had no mechanism of paying off the loan and no option to re-finance her lot due to the massive reduction in value of the lot over the course of her loan. In addition, Bank employee Ronnie Colson used high-pressure tactics to induce P. Tracy into entering into the Modification and Amendment of Note and Deed of Trust and Tracy signed that agreement under duress on January 14, 2010. J.A. 241 at ¶ 47. The waiver at issue implicates a clear public interest, was drafted in part to insulate the Bank from liability and was procured through an obvious

54

example of unequal bargaining power. For these reasons, the Court should conclude that the waiver executed by Patricia M. Tracy is unenforceable because it violates public policy. Accordingly, this Court should conclude that the waiver at issue falls within the public policy exception, while concluding that the Bank's actions in procuring the waiver to insulate itself from liability render the waiver unenforceable.

## CONCLUSION

Based on the foregoing, Defendants-Appellants respectfully request that the decisions of the District Court allowing in part the Bank's motion to dismiss, and allowing it motion for summary judgment in its entirety, be reversed, and that the matter be remanded for further proceedings.

## **REQUEST FOR ARGUMENT**

Defendant-appellants request oral argument.

This, the 4th day of August 2014.
*/s/Edward L. Bleynat, Jr.*
Edward L. Bleynat, Jr. [SB#16558]

*/s/ H. Gregory Johnson*
H. Gregory Johnson
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,958</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Edward L. Bleynat, Jr.</u>
Edward L. Bleynat, Jr.

*Counsel for Appellants*

Dated:  August 4, 2014

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on August 4, 2014, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Heather W. Goldstein
W. Carleton Metcalf
VAN WINKLE LAW FIRM
11 North Market Street
P. O. Box 7376
Asheville, NC  28802
(828) 258-2991

T. William McGee, III
Tara C. Sullivan
NELSON MULLINS RILEY
  & SCARBOROUGH, LLP
1320 Main Street
Meridian, 17th Floor
P.O. Box 11070
Columbia, SC  29211
(803) 255-9591

*Counsel for Appellees*

*Counsel for Appellees*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219